SALEH V CORRINE BROWN ET ALL COMPLAINT

UNITED STATES DITRICT COURT
MIDDLE DISTRICT OF FLORIDA
IN AND FOR DUVAL COUNTY FLORIDA
CASE: 3:17-CV-1465-J-39PDB

PLAINTIFF
MOHAMED O SALEH, MD, BCFM, FAPA, ASAM, ABPN

V

GROUP A (criminal complaint)
STATE OF FLORIDA
CORRINE BROWN, EX Congresswoman from FL 5th District
SUMMER NICHOLS Attorney in Jacksonville
AGENCY FOR HEALTH AND HUMAN SERVICES
AGENCY FOR HEALTHCARE ADMINISTRATION, FLORIDA
FLORIDA STATE DEPARTMENT OF HEALTH
BOARD OF MEDICINE ADMISTRATIVE STAFF (TO BE IDENTIFIED)
HORACE DOZIER, Field Office Manager Medicaid Integrity Office, Florida
REGINALD GAFFNEY, CEO Community Rehabilitation Center
MARK ULERI, CEO Quality Life Center
SHERIFF'S OFFICE, Jacksonville Florida
CLAUDIA KEMP, Executive Director of the Florida state Board of Medicine
REGINALD ESTELL, Attorney in Jacksonville Florida
SUSAN PNIEWSKI, Attorney in Jacksonville Florida
CARYL KILINSKI, Attorney in Tallahassee Florida
GREGG MCCAULIE, Judge Fourth Circuit Court
CARMEN GILLEY, Senior Regulatory Specialist Department Of Health
STATE OF NEVADA
THOMAS CARROLL, Chief Deputy District Attorney Clark County Nevada
OFFICE OF THE DISTRICT ATTORNEY, Clark County Nevada
UNIDENTIFIED CONGRESSPERSON AND/OR SENATOR From Nevada State
KENDRA STILL Public Safety Agent with DEA Office in Las Vegas NV on 1/11/20C 11
    UNIDENTIFIED EMPLOYEE WITH THE FLORIDA DOMESTIC DEPOSITORY
     BOARD OF DIRECTORS COMMUNITY REHABILITATION CENTER (CRC)
    GRACIELA ALTAMIRANO SALEH
    FINANCE OF AMERICA REVERSE MORTGAGE COMPANY et al

RESPONDENTS
GROUP B (Civil Complaint)
Jointly and Separately

1

NORTH FLORIDA JUDICIAL QUALIFICATIONS COMMISSION
FLORIDA STATE BOARD OF MEDICINE PHYSICIANS sitting on April 6, 2017
FLORIDA STATE BOARD OF MEDICINE PHYSICIANS was sitting on June 9, 2017
MAGDALENA AVERHOFF, MD, CHAIRWOMAN Florida Board of Medicine
SARVAM TERKONDA, MD CHAIRMAN Credentialing Committee on June 8 2017
DEREK BERMUDEZ
DUVAL COUNTY TAX COLLECTOR et al

## COMPLAINT

This is an action for money damages in excess of $ 75,000.00 (seventy five thousand dollars) for protection from bodily harm and to save the plaintiff's daughters from a bleak future.

The primary causes of action, to be expanded upon herein are Deprivation of Rights Under Color of Law and Conspiracy Against Rights and Civil Rights

## JURISDICTIONAL ALLEGATIONS

1. At all times material to this lawsuit, the Plaintiff was resident of Duval County and for a period of four years commuted every week between Clark County Nevada and Duval County Florida

2. At all times material to this lawsuit the Defendants and Respondents were residents of Duval County Florida, Leon County Florida, Dade County Florida and perhaps other counties in Florida or Clark County Nevada

3. At all times during this lawsuit some of the defendants may have been residents of a county and state unknown to the Plaintiff

4. At all times material to this lawsuit the chief instigating Defendant and ex congresswoman Corrine Brown was a resident of Duval county Florida and was commuting between Duval County and Washington in the District of Colombia.

5. At all times material to this lawsuit Defendant Ajit S Narasimhan was a resident of Costa Mesa California

6. This Honorable Court for the Middle District of Florida has Jurisdiction under the "Diversity Rule". ( Title 28 U.S.C. § 1332.)

## GENERAL FACTUAL ALLEGATIONS

7. **The Petitioner is filing this complaint today due to extreme timelines issues**

8. **The Plaintiff needs a Docket number**

9. **This Complaint, well written with all the evidence well organized will be refilled on January the second 2018.**

10. **It is literally a matter of "life or death" that the attached Emergency Petition for an Injunction is granted.**

11. **The Hearing scheduled on 1/8/2018 in Circuit Court, must not take place.**

12. The Plaintiff will be incarcerated under fabricated reasons and harm may be caused to him
13. If he does not go to the Hearing of 1/8/2018 the Police will cause him harm
14. The primary scope of all the causes of action and conspiracy(s) outlined below is to keep the plaintiff penniless, isolated, unable to earn money, unable to obtain a reverse mortgage on his unencumbered home and mired in a never ending Dissolution of marriage.
15. The second scope is to keep him in an environment from where he could be incarcerated if needed and literally eliminated. What better than "Divorce Court"
16. The third scope is to see him leave the State of Florida.
17. The fourth is to ruin his reputation so that he can never be a credible witness in a court of law; if he is called as a witness against the cabal. So far the conspiracy has succeeded in 90% of its objectives.
18. Between 2002 and 2016, when on 7.8.2016 the ex congresswoman was indicted of 22 Federal Felony Counts; her sources of illicit money were many and varied.
19. Since 7/8/2016 the ex congresswoman Corrine Brown's sources of illicit money are three community mental heath centers. De wit: The Community Rehabilitation Center (CRC), North West Behavioral Health Services (NWBHS) and Quality Life Center (QLC)
20. To be more specific NWBHS was created by the founding fathers: The Plaintiff, Dr. Saleh, Dr. Larry Richardson and the Educator Steward Washington. Dr. Saleh was the KEY element. You cannot start a CMHC without a psychiatrist willing to sign all the liability and responsibility documents required to operate a CMHC. No psychiatrist in his right mind would sign on with a "bunch of negroes".
21. The three CMHC: CRC, NWBHS and QLC were established by the Plaintiff.

3

22. On or around 1992 Dr. Saleh was approached by a Tyrone Sheffield a case manager with NWBHS and encouraged to meet with a Mark Ulerie, who was looking for a Job as he was about to be terminated from the Mental Health Center of Jacksonville (MHCJ)
23. CRC , which was a product of the Plaintiff's vision, was started as a for profit company with the name of CRTC (Community Rehabilitation and Treatment Services).  Mark Ulerie was appointed by Dr. Saleh as the Registered agent (See EXHIBIT 01)
24. CRTC BECAME SUBSEQUENTLY A NOT FOR PROFIT COMPANY AS CRC (the Community Rehabilitation Center, a requirement for contracts with the Department of Children and families.  See EXHIBIT OB (like Obstetrics), dated November 17, 1992, a living "Birth Certificate" for CRC.
25. Mr. Ulerie identified the need for a political component, and the first mistake was made.  A mistake that has cost the plaintiff his career and his family.  Bringing a Reginald Gaffney on board.
26. Mr. Ulerie recommended to bring on board a Reginald Gaffney, the "the do boy" of Corrine Brown an up and coming pol(the political Component see EXHIBIT 02) and a Stanley Twiggs.
27. By Dr. Saleh's decision and generosity, he kept 40% of the stock of CRTC and Ulerie, Gaffney and Twiggs 20% each.  However all of this was gone the moment the agency became "not for profit".
28. Before becoming the "mastermind of the minority agencies" as stated by a Jim Stivers, who was the Chief of Mental Health Services at the Department of Children and families, at the time, along with Jean Costelau a true pioneer of mental health services in the minorities community.  Dr. Saleh was educated on the Mental Health Act,  by Hermonyone Walker and  the late Arena Hutton, may God have her in his Glory.
29. With Ms.  Walker and Ms.  Hutton guiding him Dr. Saleh started Keepsafe CMHC, the FIRST true "minority CMHC"
30. Keepsafe has closed since then, allegedly because it would not pay the "CB Tax"(Corrine Brown Tax).
31. The last CMHC to be established by Dr. Saleh was Quality Life Center (QLC).
32. More specifically  QLC was started by a Carlos Carrera and was operating  and slowly dying in St Augustine.  A Emma Hayes, LMHC, who has been a loyal associate of Dr. Saleh since 1987  convinced Mr. Carrera, to move it to Jacksonville and let Dr. Saleh make it successful.
33. Once line 24 was accomplished CRC gave Mark Ulerie $ 30,000.00 (thirty thousand dollars) "severance pay" to purchase QLC.  Allegedly the muscle on Carrera was applied by the Congresswoman.  He was a reluctant seller.
34. This was necessary as Reginald Gaffney, despite his utter intellectual and interpersonal shortcoming ("Deuce")wanted to be the CEO.  All the Congressional muscle was behind him, and Corrine Brown was by now the de facto owner of CRC (albeit in the shadows).
35. Only in 2002 the plaintiff became aware how much Corrine Brown was the owner of CRC. That is when the agency was charged with Medicaid Fraud and Corrine Brown made the charges go away.  Fortunately Dr. Saleh was never included in the charges.
36. The Plaintiff, immediately after the 2002 "problem" changed the nature of his relationship with the agencies and wrote a certified letter to Medicaid and Medicare, emphasizing his arms length

dealings with the agencies cash flow. He still had the same ideals that prompted President Kennedy to sign into law the Mental Health Act on October 31st 1963.

37. CRC was started in a building at Lila street and Lem Turner co-owned by the plaintiff with another physician. That property was sold to Race Trac Gasoline company, a few years back, by the plaintiff, who was eventually the sole owner.
38. CRC was financed (see EXHIBIT 02, one of many promissory notes) nurtured by Dr. Saleh who was working for free the first six month, and developed from inception to full maturity by the Plaintiff.
39. These CMHC agencies would have never existed BUT for Dr. Saleh's willingness to sign the required statutory and licensing documents, to take the responsibility, the liability and the risks involved. It was a lot of pro bono work at the beginning. The plaintiff risked a lot of money.
40. For 15 to 19 years, from 1992 to 2013 the Plaintiff was the Medical Director of these agencies. But despite numerous efforts, he did not attend a single meeting of the Board of Directors. The dates would change, he would not receive the notice or he would be tied seeing patients. He would make his required reports in writing
41. The Plaintiff is filing this complaint at this time because he feels that his life may be in jeopardy.
42. The Plaintiff is writing a book about Corrine Brown et al "perfect crime" scheme.  *EXHIBIT L*
43. The plaintiff is certain that a Derek Bermudez, "intentionally " or "negligently" gave her a copy of the manuscript (Initial draft, still missing critical chapters and evidence).
44. The ex Congresswoman and her confederates are aware that the plaintiff could shut down the three CMHC that are the past present nd future vehicles to defraud Medicaid money.
45. The plaintiff has no idea how many individuals and agencies are part of the cabal that has ruined his life and his family life.  *PLAINTIFF DOES NOT WANT CASE DISMISSED DUE*
46. U.S. Citizens are killed for much less money than what is involved here.  *TO NOT LISTING ALL DEFENDANTS*

## COUNT ONE: CONSPIRACY TO FACILITATE A MURDER

47. The Plaintiff re-alleges and restates: the foregoing jurisdictional allegations and general factual allegations
48. As stated in line 8 in the General Factual Allegations, one of the goals of the conspiracy is to have
49. the Plaintiff in an environment from where he could be incarcerated, by a friendly Judge.
50. The Instigator of the Grand Conspiracy the ex Congresswoman Corrine Brown, 18 times felon since losing the election to congress, has only three venues to defraud taxpayers money: The Community Rehabilitation Center (CRC), North West Behavioral Health Services (NWBHS) and Quality Life Center (QLC)
51. The plaintiff was the key founder and ESSENTIAL ELEMENT to start CRC, NWBHS, QLC in the early nineties.
52. These agencies would not exist but for the plaintiff signing the initial FOUNDATION documents.

5

53. Without the "powers of congress" these agencies are the ONLY "GOLDEN EGG GOOSES"
54. For Corrine Brown.
55. The conspiracy ringleader has a partial copy of the "expose" that the Plaintiff is writing "ABUSE OF POWER COMES AS NO SURPRISE" with Corrine Brown as a novel "Lex Luthor"
56. The ex-congresswoman has made comments that she wants the plaintiff "GONE DEAD OR DEPORTED".
57. The plaintiff does not wish to "wait and see" if these comments were actually made or are just "hearsay"
58. The stakes are too high for the plaintiff to just wait and see.
59. According to Rich Tucker, Times Union Reporter, speaking about The Honorable Judge Gregg McCaulie: John Cascone running in the election against him, said "I don't think he fits the standards of what I feel is a good judge," Cascone said. "This is based on criticisms of his performance from police, bailiffs, clerks .." the real people who are there in the courthouse.
60. Let me add my two pennies: I filed a formal complaint with the Judicial Qualifications Commission against Judge McCaulie (EXHIBIT JJ). I wrote a letter to the Director of the Commission (EXHIBIT JJJ), clearly stating that "Judge McCaulie may be a good judge but is not qualified to preside over "this" Dissolution of Marriage proceedings.
61. The Proceedings have been going on since 2010. The honorable Judge Merret was presiding the first year, he was fair and then "was not re-elected"
62. The Dissolution should have ended two or three months after the Honorable Judge John Merret filed the attached holding about "VALIDITY AND ENFORCEABILITY OF PRENUPTIAL" AND TWO POSTNUPTIAL AGREEMENTS, EXHIBIT PN on 08/28/2011
63. UNFORTUNATELY the plaintiffs lawyer, Demere Mason, and perhaps the best family Law barrister in the northern hemisphere, abandoned him 10 feet from the finishing line. WHY?
64. The Plaintiff can only speculate. The Plaintiff is certain that the ex congresswoman has something to do with this
65. Sitting Judges in Duval County are rarely challenged and even more rarely unseated.
66. It is the opinion of the Plaintiff that Judge Merret lost because he was "fair" in the Paintiff's Dissolution of marriage.
67. The Honorable Judge Merret attitude towards the Plaintiff, went from cordial to "severely hostile" AFTER he lost the election.
68. Judge Harvey Jay, who took Judge Merret place presiding told the plaintiff TWICE, during a hearing, pointing a finger at him "don't worry, I will be fair to you". A judge is SUPPOSED to be fair, WHY WOULD HE SAY THAT?
69. Why he would not address the Plaintiffs comments that all that was left was calculating the correct Child Support amount, based on the income of the spouses.
70. Judge Harvey Jay, the second Judge assigned to the case, presided for over one year and then suddenly disappeared.

71. JUDGE MCCAULIE held the trial on his VERY FIRST HEARING, and to the Plaintiff's objection that there was no Court reporter, he shrugged his shoulders. A TRIAL WITHOUT A COURT REPORTER and WITHOUT A PRETRIAL HEARING?
72. The presiding Judge Gregg McGaulie is not the Judge of Record, on the docket: Brad Stetson, retired long time ago is the presiding judge (EXHIBIT DD). This fact is ominous.
73. In the Trial Judge McCaulie and the Lawyer Pniewski should have been controlled by the rule of STARE DECISI. This Rule was upheld in a myriad of Courts, from Florida Appellate Courts to US Supreme Court decisions, especially when it comes to contracts, and Prenuptial and Postnuptial Agreements are Contracts.
74. As outlined below, of the millions of dollars defrauded from Medicaid by Corrine Brown a significant portion is invested in elections. Usually African American candidates, but cooperative Caucasians will do.
75. It is the Plaintiff's opinion that Corrine Brown has something to do with Suzanne Bass winning over an incumbent. Something very very rare.
76. If the Sheriff's office does not pay attention, the day before she is to report to jail in January, Corrine Brown will be on a private jet, owned by SISSOSO MFOTONGA, free like a bird, on her way to the African Paradises.
77. Corrine Brown does not plan to spend one day in Jail
78. Unfortunately some things you can only be proven by circumstantial evidence or after the fact..
79. My former wife is not paying for her vicious, criminal and unpleasant lawyer.
80. Who is paying Susan Piniewsky?
81. Both Pniewsky, Judge McCaulie and The Judicial Qualifications Commission are co-conspirators In this complaint.
82. Susan Pniesky has filed for an illegitimate Motion to bring the defendant to the Fourth Circuit Courthouse, on 1/8/2018 where the plaintiff is certain an illegitimate order to incarcerate him will be issued.
83. The plaintiff is submitting evidence that her Motion for this Contempt Hearing is faulty and based on fantasized facts and not on real facts.
84. The Plaintiff is introducing tangible facts that her motion is a compilation of lies put together to mislead the Court.
85. EXHIBIT DIS1 DIS2 DIS3 printed from the social security website, clearly show that from January 1 2010 to December 31st 2015, The plaintiff earned only 12,000.00 (twelve thousand taxable dollars) dollars. In 2016 he earned around $ 3000 a month for six months while doing a preceptorship in Las Vegas Nevada plus his disability benefits. In 2017 his only income was disability benefits of $2174 (two thousand one hundred and seventy four dollars) dollars in disability benefits, minus $ 3,921.90 (three thousand nine hundred twenty one dollars and 0 cents) garnished by the Internal revenue Services.
86. The former wife has admitted in Court to have in her bank safety box "all" the gold that the family kept for emergencies. See attached page 39 through page 41 of the court transcripts from OCTOBER 27, 2011. THE former wife has still to produce all the gold

87. EXHIBIT B2 Is a letter from his neurologist, dated March 2013. THAT WAS THE WORST YEAR OF the Plaintiff's life, when not only he had already lost his family, but he also lost the primary tool of his trade, his Medical License to Practice.
88. For example if you compare the first motion filed for the hearing to be held on 01/08/2018 (E, with the second Motion filed for the same hearing
89. If the Plaintiff is incarcerated illegally on the 8th of January 2018, and anything happens to him, might as well move the trial to La Hague Netherland in the International Court for war criminals.
90. If he does not show up at the hearing, Jacksonville Sheriff's office agents will go out on a posse.
91. The Plaintiff is certain that there is a bounty on his head.
92. There is too much money involved.
93. The plaintiff believes that now the golden eggs may be small, but within two years the three agencies will generate about half a million to a million dollars a year each for Corrine Brown
94. The Honorable Judge McCaulie has basically said that he is a "racist".
95. The Presiding Judge The Honorable Gregg McCaulie has made comments to a reporter that his "mentor and role model is the ex Judge Mark Hulsey" "that is the reason I became a lawyer"
96. Hence a judge. To the good listener a few words are enough.
97. WHEREFORE: The Plaintiff pleads with this Honorable Court to grant the companion Petition for emergency injunction and notify Ms Pniewsky; Address: 4812 San Juan Avenue Jacksonville Florida 32210 tel. 904 3426546 email sue@firstcoastlaw.org

COUNT TWO: DEPRIVATION OF RIGHTS UNDER COLOR OF LAW AND TORTOUS INTERFERANCE

98. The Plaintiff re-alleges and restates: the foregoing jurisdictional allegations and general factual allegations
99. Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief"
100.     The Plaintiff alleges that employees of the Agency for Heath care administration in collusion with the ex Congresswoman Corrine Brown conspired to prevent the renewal of the Plaintiff's Florida Medical License.
101.     The conspirators include but are not limited to a Horace Dozier, who signed the unlawful letter dated 9/10/2012, terminating the Plaintiffs Participation in Medicaid, on account that he had pleaded "guilty" to one count of Gross Misdemeanor in Las Vegas was Nevada (EXHIBIT M The Gross Misdemeanor, filed by the then Deputy Chief District Attorney Thomas Carroll, was for "conspiracy to prescribe controlled substances to three individuals; de wit: NATHAN PICKET, KATRINA HUMES AND TYLER HENDERSON (EXHIBIT M1 M2 M3 & M4)
102.     This "Conspiracy" was the result of the unlawful modification of the original charge essentially dismissed on 3/29/2011 by the original District Attorney David Rogers (EXHIBIT B1)

EXHIBIT B2 is a subpoena from the DEA requesting a verified copy of the Medical Record held by Dr. Saleh (the custodian of record) for six patients, including NATHAN PICKETT, KATRINA HUMES AND TYLER HENDERSON

103. EXHIBIT B3 is a request from the Nevada State Board Of Medical Examiners INVESTIGATIVE COMMITTEE requesting for a VERIFIED copy of the medical record of six patients of the plaintiff, including NATHAN PICKETT, KATRINA HUMES AND TYLER HENDERSON.

104. EHIBIT B4 is an email from the Executive Director of the Nevada Board of Medical Examiners indicating that they still have in storage the medical record requested from the plaintiff and custodian of record of six patients, including NATHAN PICKETT, KATRINA HUMES and TYLER HENDERSON

105. The "original" charge cited in line 43 was for prescribing controlled substances without first obtaining a Controlled Substance Registration (CSR or C/S).

106. Lines 43,44 and 45, EXHIBITS: B2, B3 and B4, prove beyond a reasonable doubt that NATHAN PICKETT, KATRINA HUMES and TYLER HENDERSON were lawful patients of the plaintiff.

107. Examined, treated and given prescriptions for controlled drugs in his lawful office in Nevada, located at 2801 Valley View Blvd, suite 1 Las Vegas Nevada.

108. The Plaintiff had a "doctor patient relationship" with NATHAN PICKETT, KATRINA HUMES and TYLER HENDERSON. He had notes supporting their office visits, he had carbon copies of the prescriptions issued to them.

109. You cannot have a conspiracy with your own patients

110. The arrest report for the original charges cited on line 43 was written on 1/11/2011 (EXHIBIT A1 A2 & A3, and clearly states that the infraction was not having a Controlled Substance Registration (CFR), although it also states on page two that Dr. Saleh applied for a CFR in 2006.

111. The arrest of 1/11/2011 was faulty, because it occurred in Las Vegas immediately after a Disciplinary Hearing of the Nevada Board of Pharmacy

112. The arrest and incarceration in Nevada on 1/11/2011 was malicious, unlawful and wanton, because it morphed a civil infraction into an inexplicable crime.

113. 102If the Plaintiff was arrested for a civil infraction every time a surgeon makes a wrong side surgery, He or she should be incarcerated for "aggravated battery"

114. The arrest occurred on 1/11/2011, the charges were essentially dismissed by the low level D.A. David Rogers.

115. Were modified and refilled by nothing less then the Deputy Chief District Attorney Thomas Carroll 8 months later on 10/25/2011.

116. The Deputy Chief District Attorney advised the plaintiff that if he did not plead guilty to one count of Gross Misdemeanor, he would file charges for 3070 felonies against the plaintiff.

117. Because the Plaintiff did not have any criminal history, DA Carroll "promised" that adjudication would be withheld.

118. Instead the Plaintiff was actually convicted of the charges.

119. On 9/10/2012 there is a "hearing" at the Florid Agency for Health Care Administration and The plaintiff Dr. Saleh is terminated from Medicaid EXHIBIT A1 & A2 "use was CONVICTED" of the fabricated misdemeanor
120. On Ferbuary 2nd 2013 the Plaintiff was handed the attached letter EXHIBIT F indicating that on 12/10/2012 there was a meeting at the Department of health and it was decided that because
121. Dr. Saleh was terminated from Medicaid his license renewal would be denied.
122. The malignant nature of these activities is reflected on the fact that they wait until February 1st 2013, one day AFTER HIS LICENSE EXPIRED, on 1/31/2013 TO LET HIM KNOW OF THE DECISION to deny his license renewal.
123. In those 52 days that they waited Dr. Saleh could have referred his patients to other doctors and avoided many patients, the sudden realization that they did not have a doctor
124. To make matters even more shady, in March 2013, the unlicensed Dr. Saleh, is summoned for a disciplinary hearing by the Florida Board of Medicine. Discipline for failing to update his profile with the Florid Board of Medicine, that he had plead guilty to a "gross Misdemeanor in Nevada.
125. Dr. Saleh signs a Settlement agreement that fined him $ 5000, a reprimand letter in his file and to practice in "FLORIDA" under indirect supervision of Mohammed Farooque, M.D. ,PhD,.
126. Still the licensing office advises Dr. Saleh, that in order to print a license AHCA needs to remove a "block".
127. Subsequently Dr. Saleh realized that he could petition for an Administrative judge Hearing to be re-instated in Medicaid , and obtain his license. A Hearing was scheduled. (EXHIBIT  )
128. The hearing was cancelled by a Reginald Estell, a local lawyer that Dr. Saleh had known for many years and was claiming to help Dr Saleh as he knew the law "better".
129. The second Hearing was cancelled by b"an unknowns individual", by sending an email from an old account of Dr. Saleh to Karyl Kilinsky lawyer with the Department of Health. More likely than not attorney Reginald Estell, who had access to Dr. Saleh documents and briefcase.
130. Apparently did not find the password to Dr Saleh's current email
131. Furthermore, in the email he or she states that Dr. Saleh was withdrawing his renewal Application.
132. Furthermore after the Settlement Agreement cited on line 65, a second "Settlement
133. Agreement" appears" on Dr. Saleh's file with the Board of Medicine.
134. Dr Saleh FOUND OUT ABOUT THIS "SECOND" AGREEMENT from a lawyer he retained in Orlando. The lawyer indicated that it took valiant and aggressive efforts for the
135. Florida Department of Health to release this "second" "Settlement Agreement."
136. This one states that Dr. Saleh was "relinquishing his Florida Medical License". Something
137. After struggling for six months, unable to work and earn an income, why would he relinquish" his MAIN and only TOOL TO WORK AND SUPPORT HIS FAMILY?
r. Saleh returned to Nevada and reapplied for the re-activation of his Nevada Medical    License
138. The Nevada Board of Medical Examiners was perplexed at why Dr. Saleh "allegedly"

relinquished his Florida Medical License.After an entire year of investigating the Nevada Board Of Medical Examiners could not find anything that would warrant for Dr. Saleh to relinquish his Florida Medical License

139. There were no complaints against Dr. Saleh, the Florida Board of Medicine had signed a Settlement agreement for him to practice in Florida, his Florida license was not at risk to be revoked or suspended.

140. The Executive Director of the Nevada Board of Medical examiners spoke to Dr. Saleh in private, and told him. "you have a political problem in Florida" "take care of it" "but we are not going to deny a Medical License to somebody witj your skills, history of honesty and integrity in Nevada"

141. Dr. Saleh was asked to complete a 6 month preceptor-ship in Nevada and after that an unrestricted Nevada Medical License was issued to Dr. Saleh.

142. The Nevada Board of Medical examiners took it upon themselves to make sure that he was issued immediately a new DEA number and a Controlled Substance Registration By the Nevada Board of pharmacy.

143. WHEREFORE The Plaintiff pleads with this court to file this complaint in two parts, due to the complexity of the issues and the number of defendants.

144. There are more hideous causes of action against the Florida Department of Health

145. WHEREFORE The Plaintiff pleads with this Honorable Court to assign, due to the exceptional nature of the case a Pro Bono lawyer that will be reimbursed and paid as soon as the plaintiff returns to work. Better yet, since the plaintiff has a legitimate grievance to have been kept illegally from working for five years, he is entitled to monetary damage commensurate with the income that he has lost in five years

146. WHEREFORE The Plaintiff pleads with this Honorable Court to order the Department of health to vacate the unlawful "termination from Medicaid" order issued on 9/12/2012 and based on illegal, fabricated and conspiratorial charges of "conspiracy with his own patients

147. WHEREFORE The Plaintiff pleads with this Honorable Court to impeach Attorney Susan Pniewsky, cited in the companion motion for temporary injunction in light of the serious Differences between the two motions filed for the same hearing (EXHIBIT PS1 and PS2). The changes clearly indicate an attempt to mislead the Honorable Court

Respectfully Submitted

Mohamed O Saleh, MD, BCFM, FAPA, ASAM

VERIFICATION

I certify under the threat of perjury that all the contents of this complaint are the truth and nothing but the truth.